AO 91, Rev. 11/82  (J. Linehan Authorizing)

# CRIMINAL COMPLAINT

FILED #
Clerk
District Court

JAN 12 2021

for the Northern Mariana Islands

By _____

(Deputy Clerk)

| **United States District Court** | DISTRICT<br>Eastern District of Pennsylvania |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br>Wei WANG<br>a.k.a. "Alfred Wang"<br><br>**UNDER SEAL** | DOCKET NO.<br><br>MAGISTRATE'S CASE NO.<br>*12-781-M* |

Complaint for violation of Title 50 United States Code § 1701-1706

| NAME OF JUDGE OR MAGISTRATE | OFFICIAL TITLE | LOCATION |
|---|---|---|
| Honorable JACOB P. HART | U.S. Magistrate Judge | Philadelphia, PA |

| DATE OF OFFENSE | PLACE OF OFFENSE | ADDRESS OF ACCUSED (if known)<br>Peoples Republic of China |
|---|---|---|
| November 2010 to May 2012 | Philadelphia and elsewhere | |

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

From in an around November 2010 to in and around May 2012, Wei Wang, a.k.a. "Alfred Wang" and others known and unknown, within the Eastern District of Pennsylvania, and elsewhere, knowingly and willfully combined, conspired, confederated and agreed together, with each other, and with others unknown, to cause to be exported from the United States to Iran, commodities, specifically capacitors and Thyratron tubes, in violation of Title 50, United States Code, Section 1701, et seq., (the International Emergency Economic Powers Act ("IEEPA")), and the Irananian Transaction Regulations, 31 C.F.R. Part 560.

A TRUE COPY CERTIFIED FROM THE RECORD
DATED: 5-18-12
ATTEST: _____
DEPUTY CLERK, UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:

## SEE AFFIDAVIT ATTACHED HERETO.

MATERIAL WITNESSES IN RELATION AGAINST THE ACCUSED:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT (official title)<br><br>Andres M. Tapia |
|---|---|
| | OFFICIAL TITLE<br><br>Special Agent, DHS/HSI |

Sworn to before me and subscribed in my presence.

| SIGNATURE OF MAGISTRATE (1)<br><br>Honorable JACOB P. HART, United States Magistrate Judge | DATE<br><br>5-18-12 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

GOVERNMENT EXHIBIT

A

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT
### AND ARREST WARRANT

I, Andres M. Tapia, being duly sworn, depose and state:

### I.  INTRODUCTION

#### A.  General

1.      I am a Special Agent with the Department of Homeland Security, Homeland Security Investigations (HSI).  I have been a Special Agent with HSI since August 2001.  I am a graduate of the Criminal Investigator Training Program at the Federal Law Enforcement Training Center (FLETC), in Glynco, Georgia.  In addition, I have completed advanced training specific to counter proliferation investigations; specifically, the illegal exports of strategic and sensitive goods and technologies.  As a part of my current duties I am assigned to investigate counter-proliferation matters and enforce criminal violations of all U.S. export laws related to military (so-called "single-use") items, controlled "dual-use" commodities (those having both commercial and military or proliferation applications), and sanctioned or embargoed countries.

2.      Through my training and experience, as well as through discussions with other law enforcement agents, I have become familiar with federal laws relating to the unlawful exportation of goods and technology from the United States, related laws, the interpretation and application of federal laws, and federal court procedures.  I have conducted and participated in several investigations of violations of United States export laws involving national security issues.  I am familiar with illegal export schemes, which involve the trans-shipment of commodities through third parties to restricted end-users, including but not limited to end users in Iran.  I am generally familiar with methods used in the illegal exportation of U.S. technology and goods, and the financial transactions supporting those illegal activities.  I am also aware through my training and experience, that people engaged in the illegal export/transshipment of U.S. technology and goods often use cryptic and coded language to disguise the products that are being shipped and/or the ultimate destination/end-users of the exported goods.

3.      I have been involved in this ongoing investigation since August 2011 when HSI Albany sent a request to HSI Philadelphia Counter-Proliferations Investigations for assistance in the investigation of illegal exportation of U.S. manufactured technology to the Islamic Republic of Iran through a transshipment agent in Hong Kong who then ships the merchandise to Iran in violation of U.S. law.  HSI Special Agents in Philadelphia, Albany, and San Diego have been actively involved in this investigation which began in Albany in July 2011 and continues to the present.  Through my current leadership of this investigation, I am familiar with all of the information contained in this affidavit either through my own efforts or through discussions with

other agents and law enforcement investigators who have assisted me. I have also reviewed available documents relevant to this investigation. This affidavit is also based, in part, upon information provided to HSI through court-authorized search warrants, administrative subpoenas, undercover communications, and recorded conversations between the undercover agents and the targets of this investigation. In summary to date, HSI has obtained information through the use of, among other things, the following: court-authorized search warrants of the targets' email accounts, administrative subpoenas, numerous emails between two undercover agents and the targets, phone calls between the two undercover agents and the targets, and Skype "chat" conversations between the undercover agents and the targets. As this affidavit is being submitted for the limited purpose of securing a complaint and arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause for the issuance of the complaint and arrest warrant requested herein.

4.    This affidavit is presented in support of a criminal complaint and arrest warrant for Wei Wang, a.k.a. "Alfred WANG," for conspiracy to unlawfully goods from the United States to an embargoed country, in violation of Title 50, United States Code, Sections 1701-1706 (known as the International Emergency Economic Powers Act ("IEEPA")) and the Iranian Transactions Regulations, 31 C.F.R. Part 560 et seq.

5.    Wei Wang, a.k.a. "Alfred WANG," (hereinafter WANG), is a native of the Peoples Republic of China, who is conspiring with an Iranian national ("Conspirator 1") to willfully cause the export of goods from the United States to Iran without having obtained a license from the Department of Treasury, Office of Foreign Assets Control.

6.    Conspirator 1 is an Iranian national operating in Iran to obtain U.S. merchandise for shipment to the Islamic Republic of Iran in violation of U.S. law. Conspirator 1 corresponds with numerous U.S. businesses and trading companies in other countries. Conspirator 1 buys and sells products from Iran. Conspirator 1 conducts regular business with the assistance of Wei WANG a.k.a. "Alfred WANG" who resides in China, and operates a trading company KIVI Technology (HK) limited. WANG takes direction from Conspirator 1 with whom he appears to have been business partners from at least the earliest date of the emails reviewed, sometime in 2008.

7.    HSI obtained information from Microsoft Online Services for the Hotmail account used by a person identifying himself as a representative of KIVI Technology (HK) Limited (hereinafter "KIVI"), using an email account, xxxxxx.xxxxxxxx@xxxxxxx.xxx, and for email account ███████████████████. The subscriber listed for xxxxxx.xxxxxxxx@xxxxxxx.xxx is Conspirator 1 and the subscriber listed for ██████████████████████ is Alfred WANG. The IP history provided from Microsoft indicated that the account ████████████████████ was accessed from an address of ██████ ████████████████, Henan Province, China. The vast majority of the IP addresses listed in the IP history information for WANG's account from April 2007 through August 2010 belong to

2

ISPs in China. Based on this and other information I obtained in this investigation, I believe WANG is located in China, and that he operates on behalf of Conspirator 1 in his efforts to obtain commodities from the United States illegally destined for Iran.

8.     As part of this investigation, I have reviewed contents of the email accounts identified above which revealed that Conspirator 1 primarily uses his email address to obtain commodities, technologies, and goods from around the world including the United States. Emails are sent requesting price quotations from companies in the United States. In the emails, Conspirator 1 claims to be a "Research Engineer," "Manager," and sometimes "President" of at least two (2) different trading companies, KIVI and Caspian International Trading Company in Tehran, Iran. The emails showed that Conspirator 1 has been successful in transshipping goods and technologies through KIVI in Hong Kong to unknown end-users in Iran. Additional information learned, in part through review of the email files, is incorporated below.

9.     Based on my training and experience and a review of his subscriber Internet Protocol history, I believe Conspirator 1 occasionally uses internet service proxy or proxies in an effort to conceal his actual IP address. On many occasions, however, Conspirator 1 accessed his account without the use of the proxy thereby revealing that he is located in Iran.

### B. Relevant Statutes

10.    Title 50, United States Code, Section 1701, et seq., known as the International Emergency Economic Powers Act ("IEEPA"), grants the President the authority to, among other things, "investigate, . . . prevent or prohibit, any acquisition, holding, withholding, use, transfer, withdrawal, transportation, importation or exportation of, or dealing in, or exercising any right, power, or privilege with respect to, or transactions involving, any property in which any foreign country or a national thereof has any interest by any person, or with respect to any property, subject to the jurisdiction of the United States . . . ." 50 U.S.C. § 1702(a)(1)(B). Section 1701 grants the President the power to exercise this authority upon declaration of a national emergency.

11.    On May 6, 1995, President William J. Clinton issued Executive Order 12959, pursuant to IEEPA and other laws, substantially tightening the United States Government's restrictions on trade and investment activity with the Islamic Republic of Iran ("Iran"). This Executive Order expanded on the threat to national security posed by Iran as detailed in previous Executive Orders similarly limiting trade with Iran.

12.    The Office of Foreign Assets Control ("OFAC"), the office within the Department of the Treasury charged with the responsibility of administering sanctions against foreign persons and entities, promulgated regulations to implement Executive Orders relating to national emergencies relating to Iran. The following prohibitions, for instance, are included in the Iranian Transactions Regulations, 31 C.F.R. Part 560 et seq.:

3

(a)    31 C.F.R. § 560.203 prohibits "[a]ny transaction by any United States person or within the United States that evades or avoids, or has the purpose of evading or avoiding, or attempts to violate, any of the prohibitions contained in this part;"

(b)    31 C.F.R. § 560.204 prohibits "the exportation, reexportation, sale, or supply, directly or indirectly, from the United States, or by a United States person, wherever located, of any goods, technology, or services to Iran or the Government of Iran is prohibited, including the exportation, reexportation, sale, or supply of any goods, technology, or services to a person in a third country undertaken with knowledge or reason to know that" such goods/services/technology are intended for supply to Iran or the Government of Iran, or such goods/services/technology are intended to be incorporated into other goods/services/technology intended for supply to Iran or the Government of Iran;

(c)    31 C.F.R. § 560.206 prohibits a United States person, wherever located, from engaging "in any transaction or dealing in or related to (1) Goods or services of Iranian origin or owned or controlled by the Government of Iran; or (2) Goods, technology, or services for exportation, reexportation, sale, or supply, directly or indirectly, to Iran or the Government of Iran;"

(d)    31 C.F.R. § 560.207 prohibits "any new investment by a United States person in Iran or in property (including entities) owned or controlled by the Government of Iran."

13.    Section 1705 of IEEPA makes it a crime for a person to willfully commit, willfully attempt to commit, or willfully conspire to commit, a violation of any license, order, regulation, or prohibition promulgated under IEEPA, including the Iranian Transactions Regulations, 31 C.F.R. Part 560.

### C. Investigation

14.    In July 2011, HSI Special Agents obtained information from Customs Electronics Incorporated (CEI) that in November 2010, Conspirator 1 of KIVI TECHNOLOGY LTD, purporting to be located in Hong Kong, contacted CEI, a manufacturing company, through CEI's web site, and requested a price quotation for 6 units of capacitors (capacitors). These capacitors are designed to provide the electronic pulse power for ignition for explosives by rapidly discharging several thousand amperes of electrical current causing the explosive vaporization of a thin metal wire or metal foil strip resulting in the detonation or explosion of a secondary device.

15.    Upon receiving Conspirator 1's request, CEI informed him that the capacitors required a valid U.S. State Department license in order to be exported, CEI requested that Conspirator 1 provide an end user certificate (EUC) and a shipping address for the capacitors prior to CEI providing a price quotation.[1]  An End User Certificate is a document used in

---

[1] Although CEI referenced a U.S. State Department export license requirement, the capacitors are controlled for export by the U.S. Commerce Department.  The U.S. Commerce

international transfers, including sales and arms, provided as aid, of weapons and ammunition to certify that the buyer is the final recipient of the materials, and not planning on transferring the materials to another party. Conspirator 1 responded to the CEI request for an EUC by providing a shipping address and an EUC reflecting an address in Hong Kong and indicated that the capacitors would be used in the "mining industry." CEI reminded Conspirator 1 that an export license was required before CEI could export the capacitors to Hong Kong. Conspirator 1 responded by suggesting that CEI send the capacitors to a "friend" of Conspirator 1's in the United States and that this friend would send the capacitors to Hong Kong, obviating the need for the export license. Ultimately, Conspirator 1 never provided the name of the "friend" in the United States.

16.     From May 2011 to August 2011, there were numerous email messages between Conspirator 1 and CEI regarding Conspirator 1's request that the capacitors be shipped to his friend in the United States who would send the capacitors to Hong Kong. CEI again explained to Conspirator 1 that the license and the EUC were required. In the email exchanges with Conspirator 1 and CEI, and Conspirator 1 and WANG, Conspirator 1 did the following: suggested mislabeling the capacitors to avoid export license requirements, coordinated with Alfred WANG to wire money from Hong Kong to CEI for the purchase of the capacitors, and provided CEI with a shipping address in Hong Kong for the capacitors.

17.     The working relationship between Conspirator 1 and WANG is demonstrated in communications between Conspirator 1 and WANG, in which Conspirator 1 stated that he has a customer in need of two (2) types of capacitors produced by CEI. Conspirator 1 provided CEI's web address and stated that he has made an inquiry to CEI for these capacitors and included the email the correspondence with CEI. Conspirator 1 stated he has quoted his customer a price which includes estimated commissions for himself, WANG, and an unknown third party, "Chris," as well as shipping costs, which include freight from the United States to Hong Kong and from Hong Kong to Tehran, Iran. Conspirator 1 requested that WANG and "Chris" calculate their commission, plus the shipping costs from Hong Kong to Tehran, Iran. Conspirator 1 instructed WANG that upon his receipt of the estimated cost, Conspirator 1 will forward the customer's money to WANG for him to purchase the capacitors from CEI. Conspirator 1 offered that the procurement strategy implemented through Conspirator 1, WANG and "Chris" will work well in the future.

18.     On May 20, 2011, Conspirator 1 and WANG discussed a strategy to purchase, ship, and misrepresent the capacitors to avoid the U.S. export license requirement. Conspirator

---

Department is responsible for implementing and enforcing the Export Administration Regulations ("EAR") which regulate the export and reexport of items that have both commercial and military applications. The capacitors are subject to the EAR and are classified under Export Control Classification Number 1A007. However, since the capacitors were destined for Iran in violation of the Iranian Transactions Regulations, a license from OFAC was required. See 31 C.F.R. § 560.204; 15 C.F.R. § 742.8.

1 referred to a third party shipping agent, and asked WANG: "Is it possible to send goods with other name? For example, send it as common capacitor which should no need the license." Conspirator 1 requested that WANG forward to him the DHL tracking number for a shipment of goods WANG was forwarding to Conspirator 1's location in Tehran, Iran.

19.    On May 26, 2011, Conspirator 1 advised CEI by email that he (Conspirator 1) had decided to buy directly from CEI, and that he needed CEI's bank account information in order to tender payment. On May 26, 2011, CEI sent an email to Conspirator 1 which contained CEI's bank account information. On May 29, 2011, Conspirator 1 forwarded an email to WANG containing the banking information for CEI.

20.    In June 2011, CEI and Conspirator 1 exchanged emails regarding the necessity of the EUC, the license requirement, Conspirator 1's payment, and shipping information. Conspirator 1 provided the following shipping address: ▆▆▆▆▆▆▆▆ ▆▆▆▆▆▆▆▆▆ Kowloon, HK ▆▆▆▆▆▆ attention Mr. Huang. CEI advised Conspirator 1 that the total cost for the six capacitors, the export license and shipping was $821.52. Conspirator 1 forwarded to WANG all email messages he received from CEI from May 26, 2011 through June 8, 2011. In one of these forwarded messages, Conspirator 1 wrote "Dear Alfred, we shall send end user statement and money to them today. Regarding end user statement, I will make and send today. Regarding money, we shall chat. I am waiting for your to get online." Following this message, WANG responded "Enclosed tt copy of arranging payment to usa for your reference." [sic]

21.    On June 15, 2011, $821.52 was sent from the Hong Kong and Shanghai Bank Corporation (HSBC) Bank "Business Integrated Account USD Savings" Acct. #: XXX-XXXXXX-838 via international wire transfer to the Key Bank account of CEI. On that date, Conspirator 1 sent an email to CEI indicating that $821.52 was sent via international wire transfer to the Key Bank account of CEI. Conspirator 1 forwarded this email to WANG.

22.    On June 28, 2011, CEI sent an email to Conspirator 1 asking if his friend in the United States was registered to apply for an export license. CEI stated that they could not supply the capacitors to Conspirator 1's friend without knowing this information. CEI went on to again remind Conspirator 1 that an export license would be required before CEI could ship the capacitors. Conspirator 1 forwarded this email message to WANG.

23.    From August 2, 2011 to August 24, 2011, Conspirator 1 and CEI coordinated the shipment of the capacitors from the U.S. to Conspirator 1. Throughout those communications Conspirator 1 suggested various methods to avoid the licensing requirements. At HSI's direction, CEI explained to Conspirator 1 that altering the shipping and invoice paperwork to disguise the actual shipment was not consistent with their standard practices but that, based on the small size of the order and the fact that Conspirator 1 had promised CEI future business, at his request, CEI would invoice and deliver the capacitors reflecting different part numbers to avoid the licensing requirement. Conspirator 1 directed CEI to send the capacitor shipment to the previously

6

identified address in Kowloon, Hong Kong. The email further requested that CEI provide Conspirator 1 with the FedEx tracking number when the shipment was sent. Conspirator 1 forwarded this message to WANG. WANG responded that he was waiting for the tracking number. The following day, WANG sent an email to Conspirator 1 asking for photographs, goods/packing weight and invoice for the capacitors.

24.    On August 18, 2011, at HSI's direction, CEI packaged six (6) export-controlled capacitors for shipment to Conspirator 1. These six (6) capacitors were packaged with several documents which listed false part numbers for the capacitors, as was previously requested by Conspirator 1, to circumvent requirements for an export license. On the same date, HSI and other law enforcement agents intercepted the FedEx shipment in New York. CEI subsequently emailed the Fed Ex tracking and other information about the package to Conspirator 1 who forwarded it to WANG, with the comment that "XKM capacitors are on their way by FedEx to you...."

25.    On August 24, 2011, CEI emailed Conspirator 1 that U.S. CUSTOMS had seized the capacitors.

26.    In August 2011, CEI referred Conspirator 1 to an "electronics wholesale company" which was an undercover company employed by ICE/HSI for this and other investigations (hereinafter the UCC). The company contact was the assumed name of an undercover agent (hereinafter the UCA) operating in Philadelphia, Pennsylvania, in the Eastern District of Pennsylvania. From August 2011 through May 2012, the Philadelphia UCA was in contact with Conspirator 1 negotiating the illegal procurement of the capacitors and other sensitive U.S. origin export controlled technologies, parts and commodities to the Islamic Republic of Iran.

27.    From August 2011 to May 2012, Conspirator 1 and the UCA exchanged numerous emails and participated in approximately 4 telephone calls. In the early emails, the UCA told Conspirator 1 that he understood that the merchandise Conspirator 1 had previously purchased from the U.S. distributor had been seized by Customs, and stated that he would be willing to attempt to get the shipment released. The UCA further offered assistance in procuring items for Conspirator 1 in addition to the capacitors that Customs had seized. Conspirator 1 forwarded most of the email messages he received and sent to the UCA to WANG.

28.    From August 2011 to May 2012, Conspirator 1 negotiated the purchase and shipment of 4 capacitors, and 10 Thyratron tubes. In the emails, Conspirator 1 reiterated his difficulty in getting an export license from the United States, and said that he understood from previous emails that the UCA could assist him. Conspirator 1 described his trading company located in Hong Kong. Conspirator 1 explained that some of the parts he has attempted to purchase required an export license and which causes constant problems. The UCA explained that the capacitors seized by Customs were being held because they were mislabeled and that was

7

a criminal violation. The UCA asked Conspirator 1 if he told the original equipment manufacturer (OEM) to change the description on the shipping information. Conspirator 1 admitted to that he did and that it was his (Conspirator 1's) idea to do so. The UCA explained that he was having difficulty getting the parts back from Customs and said that there may be a criminal violation with the OEM and/or Conspirator 1.

29.    During the communications related to the capacitors, Conspirator 1 told the UCA that applying for an export license was a delay and that he did not want to apply for a license. Conspirator 1 asked the UCA if the UCA could purchase the capacitors without an export license and send the parts to Conspirator 1. The UCA said that he could do so, but the paperwork would have to be falsified. The UCA suggested that Conspirator 1 provide a false name so that the capacitors would not be detained by Customs. Conspirator 1 stated that he would provide the UCA with another name for shipping documents. Conspirator 1 asked how the UCA could send the parts without an export license, adding that the last time the capacitors were sent without a license they were seized by Customs. The UCA explained that this why they needed another name and address. The UCA explained that he could provide the capacitors for Conspirator 1, but it would cost Conspirator 1 more money because the UCA was taking a risk to provide the parts to Conspirator 1. Conspirator 1 said he understood and asked the UCA how much money it would cost. The UCA explained that he would charge Conspirator 1 $100.00 for each capacitor because he was taking the risk to send Conspirator 1 the parts without the required export license. Conspirator 1 agreed to pay $100 but asked the UCA for a better price for a bulk order of 10,000 for additional capacitors. The UCA stated that an order of 10,000 capacitors was a large risk for the UCA. Conspirator 1 indicated that he understood, but added that a larger order of capacitors was of greater benefit.

30.    On October 1, 2011, Conspirator 1 sent the UCA an email in which Conspirator 1 wrote: "Please note that we made decision to buy 2 pcs of each type, so we need 2 pcs of XKM1A352254K and 2 pcs of XKM1A352104K. So please let us know how the price for these 4 pcs and shipping fee to HK, and we will wire you the total price. For your reference, our purchase order has been attached." The heading of the purchase order Conspirator 1 attached read "KIVI Technology" and the footer read: KVI Technology (HK) Limited, Address: ▇▇▇▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Guangdong, China, Post Code ▇▇▇▇ Tel/Fax: +▇▇▇▇▇▇▇▇.

31.    In October 2011, the UCA provided Conspirator 1 with a price quote for the Thyratron tubes Conspirator 1 had requested, listing them as used at a cost of $4,272.00 per unit, with the shipping terms to be determined. The UCA provided Conspirator 1 with the UCA's undercover bank account information.

32.    On October 4, 2011, the UCA received an email from Conspirator 1. Conspirator 1 wrote: "No problem for not answering my calls, I can fully understand you and I think it is better to have communication via emails. And I must tell you that I completely understood what you told me on the phone and I can understand about our transaction. Also I hope we can

8

establish long time relation. We will send you 460 USD for price of 2 pcs of XKM1A352254K and 2 pcs of XKM1A352104K + shipping fee to Hong Kong. Regarding address, please note that it is our warehouse in Hong Kong and we send all our purchases to this address. Also we have sent many things from USA to our Hong Kong address after USA custom seized our 6 pcs of capacitors without any problem. But we will send you another name and address to be sure about this. Anyway, after you receive our 460 USD, please put the order for 4 pcs of capacitors on the OEM and try your best to force the OEM to produce them as soon as possible. Then when they are ready to ship, we will tell you another name and address." In another email that day, Conspirator 1 stated that he would like to send the $460.00 via Western Union. Later, the UCA received an additional email from Conspirator 1 asking for the UCC's bank address and beneficiary's name. Subsequently, the UCA provided the UCC bank account information.

33.    On October 11, 2011, WANG sent Conspirator 1 an email message. WANG wrote "I got a call from PSBC about sending $460 to (UCA name) in USA. They said they got USA response that the beneficiary's name and account is not matched. Please kindly contact (UCA name) and ask him check and send correct info. We need to hand the correct name and matched account within 5 working days, or they may return the money." WANG provided an exact match of the undercover bank, undercover bank account number, routing number, SWIFT number and address. Conspirator 1 wrote WANG back stating that Conspirator 1 would check with the UCA that day.

34.    October 26, 2011, the UCA received $460.00 via Western Union from Conspirator 1 for the purchase of the capacitors.

35.    From November 1, 2011 through November 29, 2011, the UCA received several emails from Conspirator 1 inquiring as to the status of the orders for the capacitors, the Thyratron tubes, and the other export-controlled commodities. Conspirator 1 told the UCA that he was prepared to send the UCA $27,500.00, fifty percent of the UCA's negotiated price for the Thyratron tubes, and asked the UCA where he should send the money. The UCA asked Conspirator 1 to send the deposit by bank wire transfer and the UCA provided the undercover bank account information. Conspirator 1 told the UCA that Conspirator 1 would send the money soon and stated that he would inform the UCA when to expect to receive the $27,500.00. On November 23, 2011, Conspirator 1 forwarded the UCA's undercover bank account information to WANG.

36.    On December 1, 2011, WANG sent Conspirator 1 an email message. WANG wrote "We got the $41,000 today, thanks. Enclosed TT copy for ILS and (UCA name) for your reference. The bank charge are both $15. So, the balance is $41000-$3120-$8160-$27500-$15x2=$2190. Please kindly check and confirm, thanks." [sic] I know from this investigation, that "TT" is a telegraphic transfer indicating a real-time interbank payment. "ILS," Inventory Locator Service, is a company that facilities an e-Market place for aviation, marine, and defense industries. I know that Conspirator 1 has an account with ILS.

9

37.    On December 5, 2011, the UCC's bank account received $27,500.00 from Conspirator 1 through the HSBC bank account, "Business Integrated Account USD Savings" Acct. #: xxx-xxxxx-838. The next day, the UCA confirmed for Conspirator 1 there was a pending wire transfer in the amount of $27,000.00 in his bank account. The UCA explained that he already contacted the manufacturer of the Thyratron tubes regarding a pending order. The UCA reported to Conspirator 1 that also inquired as to the capacitors and the advised that they were dealing with quality control issues regarding the capacitors. The UCA told Conspirator 1 that he explained to the company that the UCA needed the capacitors as soon as possible for a customer (Conspirator 1). Conspirator 1 provided the UCA with receipt of payment from Hong Kong and Shanghai Bank Corporation (HSBC) Bank.

38.    On December 11, 2011, the UCA received an email from Conspirator 1 in which he stated that he was happy to hear that the UCA received the $27,500.00. Conspirator 1 stated "it is not $27,000.00." Conspirator 1 asked the UCA if he had placed the order with the manufacturer of the Thyratron tubes. Conspirator 1 asked the UCA if he had received the capacitors.

39.    On December 16, 2011, the UCA emailed Conspirator 1 asking if the Thyratron tubes would be used in a military application. The UCA went on to explain that the OEM inquired about an export license for Thyratron tubes. The UCA told Conspirator 1 that he lied to the OEM, as "you requested" by telling the OEM would not be exported. Conspirator 1 responded that he required exactly the L4886 as it was listed on the OEM website, stating that it is "in accordance with MIL-PRF-1/1361 standard and we need exactly in accordance with this standard." In January 2012, the UCA emailed Conspirator 1 he expected to receive word regarding the capacitors and Thyratron tubes in the coming weeks and asked Conspirator 1 to be patient. Conspirator 1 responded that he was awaiting good news from the UCA and stated "I am sure you can understand my urgency."

40.    On May 4, 2012, the UCA asked Conspirator 1 for an address to ship the capacitors. Conspirator 1 provided an address of with ██████████████████ ██████████████████████████████████████ HONG KONG, ATTN: C███████ S███ F███. The UCA informed Conspirator 1 that the capacitors were shipped. Conspirator 1 asked the UCA if these were the newly manufactured capacitors. The UCA responded that they were the new capacitors. Conspirator 1 thanked the UCA for the prompt reply and for the photographs of the capacitors.

41.    From January 2012 to the present, WANG and Conspirator 1 also communicated with a UCA (UCA2) in San Diego to obtain capacitors, Thyratron tubes, and a Navigat gyrocompass for illegal export to Iran. As recently as last week, Conspirator 1 arranged with UCA2 to have UCA2 meet in Saipan to inspect and purchase the electron tubes Conspirator 1 ordered from UCA2.

42.    On April 3, 2012, Conspirator 1 solicited the UCA2 for assistance in procuring

10

Thyratron tubes.

43.     From April and the beginning of May 2012, Conspirator 1 and the UCA2 communicated through numerous emails and Skype chat conversations.  Conspirator 1 and the UCA2 agreed to terms for the sale of five Thyratron tubes and a Navigat 2100 marine application gyrocompass, manufactured by Northrop Grumman.  HSI Special Agents in San Diego purchased 5 Thryatron tubes and a Navigat gyrocompass.  The UCA2 provided Conspirator 1 with photographs evidencing UCA2's possession of the goods sought by Conspirator 1.  Conspirator 1 recently agreed to send an employee of his company to meet the UCA2 in Saipan during the week of May 21, 2012, in order to inspect the Thratron tubes and gyrocompass, make final payment and verify the shipment of the Thyratron tubes from Saipan to Hong Kong.  Upon review of emails received from a refreshed search warrant of Conspirator 1's email account, WANG wrote Conspirator 1 a message discussing the flight to Saipan, stating "only Asiana Airlines available, delta is too much expensive. Even for Asiana airline, some days there is only business class which is much more expensive, ecomomic class is few. We have to set the ticket earlier. For the trip, at least we need book 4 days..16th left, 17th at korea and 19th back, 18th meet (UCA2) at saipan."  Further, in an effort to be able to identify the person UCA2 will meet in Saipan, UCA2 asked Conspirator 1 for a picture of the employee Conspirator 1 was sending to inspect the Thyratron tubes and gyrocompass.  Conspirator 1 sent an email to UCA2 with an attached copy of WANG's Chinese passport.

44.     Conspirator 1 sent WANG an attachment with an email dated May 14, 2012.  Within this attachment Conspirator 1 wrote "Dear Alfred. Since you will have a face to face meeting to new [undercover name of UCA2], I decided to prepare this word file and tell you everything you must know. Please read it carefully and also please note to red lines more carefully." In this five page attachment Conspirator 1 writes detailed instructions to WANG explaining what WANG should tell the UCA2, as well as what information WANG should not divulge to the UCA2 during the meeting.  Conspirator 1 relayed to WANG that the company that introduced UCA2 to Conspirator 1 stated that the goods Conspirator 1 was attempting to purchase needed an export license and that they needed to produce an end user statement, which Conspirator 1 told the company Conspirator 1 could not provide. Conspirator 1 stated that UCA2 provided him with two options with regard to acquiring the goods. Conspirator 1 wrote "(UCA2) sent me email and told me we have 2 ways: Presenting end user information and getting export license. Not presenting end user information and in this method, (UCA2) will present another country end user information and get export license, then when goods are ready, he will ship to that country and from that country to HK. The method B was good and I selected it." Conspirator 1 discussed the Navigat order with WANG.  During this discussion, Conspirator 1 wrote "I asked him about an example and he told me he has worked on some models of Navigat. I asked him about Navigat 2100 and I told him I may find customer for Navigat 2100, because I have heard about this before. He told me an Iranian customer (let me tell you that it seems he has direct relation to Iranian too)." Finally, in this instruction document Conspirator 1 cautioned WANG stating "Also I have told him that we have never worked with Iran."

11

## III.   CONCLUSION

45.     I believe based on information obtained in this investigation that "Alfred WANG" is Wei Wang, a Chinese national, and Conspirator 1 is an Iranian national.  In March, 2010, WANG sent an email to an individual named "Chris" in which WANG included, ". . . . My fist name is Wei, last name is Wang.  As my friend request, please write [Conspirator 1] in Line 2."  I have also reviewed a business agreement that listed WANG as the General Manager of KIVI Technology (HK) LTD and his nationality as Chinese.  In the agreement, the HSBC Hong Kong bank account number XXX-XXXXXX-838 was included.  This is the same bank account used for each of the payments made by Conspirator 1 for the transactions with CEI in New York, with the Philadelphia UCA, and for the parts requested from UCA2 in San Diego.

46.     On May 10, 2012, HSI Special Agents obtained information from the Department of Treasury, Office of Foreign Assets Control, which revealed that there were no records of applications received or of OFAC licenses issued either Conspirator 1, Alfred Wang, Wang Wei, Caspian International Trading Company, Kivi Technology or MRT Technology.  On May 12, 2012, HSI Special Agents queried the Department of Commerce, Export Control Automated Support System and found no license histories for Conspirator 1, Alfred WANG, Wei Wang, KIVI Technology (HK) Limited, Caspian International Trading Company, or MRT Technology for any export of any commodity out of the United States.

47.     Based on the facts set forth herein, I believe that there is probable cause to believe that from in and around November 2010, to in and around May 2012, Wei Wang, a.k.a. "Alfred WANG," and at least one other,  within the Eastern District of Pennsylvania, and elsewhere, did knowingly, and willfully combine, conspire, confederate and agree together, with each other, and with others

unknown, to cause goods to be exported from the United States to Iran, specifically capacitors and Thyratron tubes, in violation of Title 50, United States Code, Section 1701, et seq., (the International Emergency Economic Powers Act ("IEEPA")), and the Iranian Transactions Regulations, 31 C.F.R. Part 560.   As such, I am seeking an arrest warrant for the arrest of Wei Wang, a.k.a. "Alfred Wang."


_____

Andrés M. Tapia
Special Agent
U.S. Department of Homeland Security
Homeland Security Investigations


Sworn to me this


__18__ day of May, 2012

_____
HONORABLE JACOB P. HART
UNITED STATES MAGISTRATE JUDGE


13